176 So.2d 133

William A. SMITH

v.

MARQUETTE CASUALTY COMPANY.

No. 47601.

June 7, 1965.

John P. Navarre, Oakdale, for respondent.

HAMLIN, Justice:

In the exercise of our supervisory jurisdiction (Art. VII, Sec. 11, La.Const. of 1921), we directed certiorari to the Court of Appeal, Third Circuit, in order that we might review its judgment which awarded plaintiff damages in the sum of $3,713.25 and reversed a judgment of the trial court which had dismissed plaintiff's action at his costs. 169 So.2d 750, 247 La. 364, 171 So.2d 479. No argument was made nor briefs filed in this Court; the matter was submitted on the record as compiled in the Court of Appeal and on the arguments presented in application for certiorari.

On October 10, 1962, plaintiff, William A. Smith,[1] a guest passenger in a 1962 Austin-Healy Convertible automobile owned and operated by Daniel Goings, was injured when an accident occurred. The present direct action ensued against Marquette Casualty Company, the liability insurer of Goings.

---

1. Although plaintiff testified that his name was William R. Smith, he designated himself as William A. Smith in his original petition and this matter is entitled, "William A. Smith vs. Marquette Casualty Company." We shall refer to him as William A. Smith.

"The undisputed facts showed that the Goings vehicle, with plaintiff and James Meylian as guest passengers, was proceeding east on Louisiana Highway 10. The blacktop highway where the accident occurred is 18 feet in width and relatively straight and flat with shoulders of about 8 feet. The highway and the shoulders were dry and in good condition.

"Plaintiff and the driver Goings received injuries when the automobile in which they were riding struck a bridge railing on the wrong side of the highway and went into a ditch. The accident occurred when the driver Goings pulled partially onto the right shoulder of the road in order to avoid colliding with an oncoming pulpwood truck which had partly entered Goings' proper lane of traffic when crossing the bridge. In turning sharply back onto the highway in order to avoid the bridge abutment, Goings lost control of his vehicle and struck the railing. The identity of the owner or the driver of the pulpwood truck is unknown, the truck having left the scene of the accident without stopping.

"* * *

"The investigating State Police officer, Jack LeBlanc, testified that he found about ten feet of skid marks from the right tires of the Goings vehicle on the shoulder of the road beginning about 80 feet from the west end of the bridge. The skid marks then angled back onto the highway and across it to the point of impact with the bridge railing." [2]

The trial court found that Goings' speed was excessive; that it was at a rate of 65 to 70 miles per hour. Nevertheless, it found that the excessive speed was not a proximate cause of the accident; it concluded that the sole proximate cause of the accident was the negligence of the driver of the unidentified truck which ran Goings' automobile off the road.

The Court of Appeal found that there was ample evidence to support the trial court's finding of Goings' speed at 65 to 70 miles per hour, and that in view of the 60 mile per hour speed limit Goings' speed was excessive. It stated, "We do not believe Goings would have lost control of his sports car had he not been driving at an excessive rate of speed. Thus we find Goings was negligent and that his negligence so contributed to the accident that it constituted a proximate cause of plaintiff's injuries." The Court of Appeal likewise found that plaintiff was not contributorily negligent in not warning Goings to slow down, because the other guest passenger, James Meylian, had warned Goings about his fast driving only a few minutes before the accident occurred.

2. These facts are recited by the Court of Appeal, 169 So.2d 750, 751.

In application for certiorari, relator, Marquette Casualty Company, assigned the following errors to the judgment of the Court of Appeal:

1. The Court of Appeal erred in holding that Goings was traveling at a speed in excess of the applicable speed limit.

2. The Court of Appeal erred in failing to find that the sole proximate cause of the collision was the negligence of the driver of the unidentified oncoming truck in invading Goings' lane of traffic, thereby creating a sudden emergency.

3. The Court of Appeal erred in holding that it is the duty of a driver to slow his speed when approaching a bridge and meeting an oncoming vehicle, even though the bridge is wider than the highway, and there are no signs indicating that the bridge is narrow or otherwise cautioning approaching drivers.

4. The Court of Appeal erred in holding that a driver approaching a bridge of sufficient width to accommodate two-way traffic at all times may not rely on the assumption that oncoming traffic will remain on its proper side of the highway.

5. The Court of Appeal erred in holding that Goings' speed, even assuming that it was slightly in excess of the speed limit, was the proximate cause of the accident in this case.

6. The Court of Appeal erred in failing to find that plaintiff was contributorily negligent even if Daniel Goings was negligent.

We find, as did the two lower courts, that Goings was driving at an excessive speed at the time of the accident. Our finding is affirmed by the testimony of plaintiff and the other guest passenger James Meylian, and also by the following testimony of Goings himself:

"Q. How fast were you traveling at the time of the accident?

"A. Approximately, maybe sixty miles an hour. Approximately, sixty.

"Q. You say approximately sixty. Could you have been going over sixty?

"A. I could have.

"Q. Could you have been going as fast as seventy or seventy-five miles an hour?

"A. I could have, sir, I didn't check the speedometer at the time.

"* * *

"Q. The police officer testified that you indicated that you had been driving about fifty miles an hour. Can you state approximately to your best recollection of your approximate speed?

"A. I would say about sixty.

"Q. Now there is some testimony that you could have been doing seventy or seventy-five.

"A. Yes.

"Q. Could you have been traveling faster than sixty?

"A. I could have.

" * * *

"Q. Were you driving at your usual rate of speed?

"A. Yes.

"Q. Do you know what your usual rate of speed is?

"A. Between fifty-five, sixty-five, seventy."

James Meylian testified in oral deposition that he had cautioned Goings about his driving, at which time Goings was doing around seventy-five or seventy. Plaintiff affirmed the fact that Meylian had cautioned Goings to slow down some few miles back from the scene of the accident; he said that he did not protest, because "Meylian had already told him one time to slow down."

The following testimony of the driver Goings (substantiated by the testimony of Meylian) sets forth his version of the accident:

"Q. Mr. Goings, would you tell us in your own words exactly how this accident occurred?

"A. We were traveling east on the highway and there was this truck coming down the road. It seemed to come across the white line on the highway and I turned to the right to keep from hitting it and lost control of the car.

"Q. Do you know what type truck it was?

"A. A paperwood truck.

"Q. Do you know the model or make or the color of the truck?

"A. No, I don't.

"Q. When did you first see this truck?

"A. It was coming down the road a good ways.

"Q. And when did he, I believe you said he went over the white line?

"A. Yes.

"Q. Approximately, where was he when he went over the white line?

"A. He was very close to my car, across the white line.

"Q. How far across the white line did his truck get?

"A. I don't really remember how far across the line * * * it couldn't have been too far or he would probably have hit me then, or we would have run together.

"Q. Would you say that one of his wheels would have been across the white line or both of his wheels?

"A. The front wheel. The front wheel went across the white line.

"Q. Did you apply your brakes first or take to the shoulder first?

"A. I took to the shoulder first.

"Q. Do you recall ever applying your brakes?

"A. Yes.

" * * *

"Q. Do you know when you applied your brakes?

"A. I applied them before I hit the bridge * * * I know that, because when I stopped my foot was still on the brake.

"Q. And exactly where did you hit the bridge?

"A. I hit it on the left-hand side.

"Q. In other words, you went off the right and traveled some distance there and then went across the road and hit the bridge on the left side. Is that correct?

"A. Yes.

"Q. Did your car stop when you hit the side of the bridge or did it travel further?

"A. No, it traveled further.

"Q. Do you know how much further it traveled?

"A. No, sir, I don't."

Not having the benefit of the truck driver's testimony, since he is unknown and therefore not made a party to this suit, we are limited to the evidence presented by the occupants of Goings' car and the State Trooper who investigated the accident. Accepting Goings' testimony as correct relative to the events preceding the accident, we have posed for our determination the questions of whether a sudden emergency was present and whether Goings' conduct under the prevailing circumstances was such as to be a proximate cause of the accident.

We find that under the facts and circumstances herein Goings was faced with an emergency, but we do not find that the emergency was one to which he did not contribute nor to which he did not add peril. Goings did not slow down when he approached the bridge (Zanca v. T.S.C. Motor Freight Lines, La.App., 59 So.2d 483), nor did he slow down when he viewed the position of the oncoming truck. Cf. Motors Ins. Co. v. Moore, La.App., 62 So.2d 150. The evidence, as found supra, affirmatively reflects that Goings was driving at an excessive speed, and that his speed was greater than was reasonable and prudent under the conditions and potential hazards existing. LSA–R.S. 32:64. It was after Goings cut to the right shoulder of the road that he lost

control of his car, and it was then that his car careened on the bridge and hit the railing. Speed was certainly a factor in causing this movement of the car; Goings himself testified:

"Q. Could one of the factors in your losing control have been the speed at which you were going?

"A. It could have been, sir."

■ The doctrine that, "A motorist confronted by a sudden emergency not caused by him is not held to the same accuracy of judgment or degree of care as in ordinary circumstances. He is not necessarily negligent because he makes a mistake of judgment or fails to adopt the best or wisest course for averting injury, and is not liable for injury if he exercises reasonable care or prudence, considering the circumstances", 60 C.J.S. Motor Vehicles § 257, p. 624, Jones v. Continental Casualty Co. of Chicago, Ill., 246 La. 921, 169 So.2d 50; Snodgrass v. Centanni, 229 La. 915, 87 So.2d 127; Fouche v. St. Paul Fire & Marine Insurance Co., La.App., 153 So.2d 180; Peeples v. Dobson, La.App., 99 So.2d 161; Walter v. New Amsterdam Casualty Company, La.App., 130 So. 2d 476, is not applicable to the facts of the instant case. It is available only to a person who is proceeding carefully and prudently on the occasion of the sudden emergency and who does not contribute to its creation. Fulmer v. United States Fidelity & Guaranty Co., La.App., 5 So.2d 923.

■ We conclude that the doctrine that, "A motorist who, by his improper conduct, creates or contributes to an emergency cannot avoid liability for an injury on the ground that he acted in the stress of emergency", 60 C.J.S. Motor Vehicles § 257, p. 628; Independent Oil Refining Co. v. Lueders, 17 La.App. 154, 134 So. 418; Pierce v. Leonard Truck Lines, 18 La.App. 448, 138 So. 199; Stromer v. Dupont, La.App., 150 So. 32, is applicable to the facts herein. We also conclude, as did the Court of Appeal, that Goings was negligent in driving at an excessive rate of speed and that his negligence constituted a proximate cause of plaintiff's injuries. Cf. Independent Oil Refining Co. v. Lueders, supra; Wise v. Agricultural Insurance Company, La.App., 140 So.2d 662.

■ A guest passenger is not required to monitor the operation of an automobile, nor is he required to pay attention to the road and other traffic conditions in the absence of a showing that he has actual or constructive knowledge that the driver is incompetent or unfit to operate the vehicle. White v. State Farm Mutual Auto. Ins. Co., 222 La. 994, 64 So.2d 245. He might, however, be denied recovery of damages when he has assumed a particular risk or has not warned the driver of a danger of which he is aware. White v. State Farm Mutual Auto. Ins. Co., supra. As stated supra, Goings had, just prior to the accident, been cautioned of his excessive speed by his guest

Meylian.  Therefore, we do not find that it was incumbent upon plaintiff to reiterate the warning, nor do we find that he was contributorily negligent in not doing so.

"If a guest protests to the driver as to particular negligent acts or conduct, he is generally not required to protest further, unless the first protest is not heeded.  If there are several guests in the vehicle, an audible protest by one of them is generally sufficient."  61 C.J.S. Motor Vehicles § 489b, p. 111.

No error was assigned in the application for certiorari with respect to the damages ($3,713.25) awarded to plaintiff by the Court of Appeal.

For the reasons assigned, the judgment of the Court of Appeal, Third Circuit, is affirmed.  All costs are to be paid by defendant.

176 So.2d 138